# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION AT DAYTON

CHARLENE M. GATES,                    :

     Plaintiff,                    :

                                    Case No. 3:12cv00220

 vs.                                   :

                                    District Judge Walter Herbert Rice

CAROLYN W. COLVIN,                    :    Chief Magistrate Judge Sharon L. Ovington
Commissioner of the Social
Security Administration,              :

     Defendant.                    :

---

# REPORT AND RECOMMENDATIONS[1]

---

## I.    Introduction

     Plaintiff Charlene Gates brings this case challenging the Social Security Administration's denial of her applications for Supplemental Security Income (SSI) and Disability Insurance Benefits (DIB). The case is before the Court upon Plaintiff's Statement of Specific Errors (Doc. #9), the Commissioner's Memorandum in Opposition (Doc. #12), Plaintiff's Reply (Doc. #13), the administrative record (Doc. #6), and the record as a whole.

     Plaintiff seeks an Order reversing the ALJ's decision and remanding the case to the Social Security Administration for payment of benefits. Or, alternatively, Plaintiff seeks a remand for further administrative proceedings. The Commissioner asks the Court to affirm

---

    [1] Attached hereto is NOTICE to the parties regarding objections to this Report and Recommendations.

the Social Security Administration's decision to deny Plaintiff's SSI and DIB applications.

The Court has subject matter jurisdiction over the parties' case and controversy. *See* 42 U.S.C. §405(g).

## II.    Background

### A.    Plaintiff and the Administrative Proceedings

Plaintiff filed applications for DIB and SSI in December 2007 asserting that she was eligible for benefits beginning on August 3, 2003 due to osteoporosis, complications from kidney transplants, high blood pressure, low-back pain, short-term memory loss, left-hand numbness, and migraine headaches. (Doc. #6, PageID at 216). This was not her first benefits application; Administrative Law Judge Melvin A. Padilla previously denied her DIB and SSI applications on September 20, 2006. *Id*., PageID at 105-114.  ALJ Padilla's decision is not at issue in this case.  Instead, Plaintiff challenges ALJ David A. Redmond's decision dated December 6, 2010.

On the date of her alleged disability onset, Plaintiff was 44 years old and thus a "younger person" under Social Security Regulations. *See* 20 C.F.R. §§ 404.1563(c), 416.963(c).[2] When ALJ Redmond issued his December 2010 decision, Plaintiff was 52 years old or a "person closely approaching advanced age." 20 C.F.R. §§ 404.1563(d). Plaintiff testified during ALJ Redmond's evidentiary hearing that she attended four years of college, earning a bachelor's degree in psychology. (Doc. #10, PageID at 83). She held various jobs

---

[2] The remaining citations will identify the pertinent DIB Regulations with full knowledge of the corresponding SSI Regulations.

including assembly-line worker, waitress, sales clerk, and case manager.

During ALJ Redmond's hearing, Plaintiff testified that the biggest problems affecting her ability to work included forgetfulness, pain, osteoporosis. Her pain is mainly in her back and down her left leg. Her spleen has been removed, and this causes her to get sick easily. A lot of times, a simple cold will develop into pneumonia or will linger for several months. (Doc. #6, PageID at 91). Plaintiff has suffered from shingles on her left side, which goes numb. Her hands go numb and "stiffen up" and cause her to drop things. *Id*., at 90. She has diverticulitis; it causes diarrhea, cramping, and stomach pain. She has undergone two kidney transplants but "hasn't really had a lot of problems with the transplant itself as long as [she's] on [her] medications." *Id*. Plaintiff takes eight prescription medications that cause fatigue. She also experiences headaches and often experiences chest pain. (Doc. #6, PageID at 84-85).

Plaintiff explained that she can be on her feet for maybe 10 or 15 minutes at a time. She experiences numbness when she sits and thus needs to "get up frequently, walk some, and sit some." *Id*., PageID at 85. She estimated that she could maybe lift 5 to 10 pounds. She cooks for herself by using the microwave oven or by preparing easy-to-fix food. Her daughter does her laundry, and someone usually takes her grocery shopping. She likes to sew but does not sew as much as she used to because she gets frustrated with it. She also has trouble concentrating.

Plaintiff has crying spells at times and feels hopeless and irritable.  She explains, "I get upset sometimes because I can't do things that I used to do. I don't feel like I can spend

the time that I want with my grandchildren ...." *Id*., PageID at 92.

During a typical day, she watches television and tries to get outside and walk a little. If she has a bad night with little sleep, she will go back to bed after waking. There have been days when she has stayed in bed most of the day. She has trouble walking up stairs; she gets out of breath and sometimes her knees will give out. She has trouble bending and tying her shoes.

Plaintiff's memory problems become manifest when she sometimes forgets what she is talking about during a conversation and when she cannot remember certain people. She has left the stove on, and once her kitchen caught fire. She forgets to take her medications and needs her daughter to make sure she takes them.

Sometimes Plaintiff gets dizzy spells, and she will "kind of fall over against the wall." *Id*. PageID at 91.

In Plaintiff's Statement of Errors, her counsel explains (with citations to the medical records):

> Ms. Gates had two kidney transplants; the second in 1999 after her first was rejected. These transplants required Ms. Gates to take immunosuppressant medications so that her body would not reject the kidney. When Ms. Gates could afford her immunosuppressant medication she would take them consistently. The immunosuppressant medications combined with Ms. Gates removed spleen caused her to be easily susceptible to catching colds that lasted for months and often turned into pneumonia....

(Doc. #9, PageID at 1709).

## B. Plaintiff's Medical Records and Medical Source Opinions

In March 2008, clinical psychologist George Schulz, Ph.D. evaluated Plaintiff at the

4

request of the Ohio Bureau of Disability Determinations. Intelligence testing placed
Plaintiff's verbal IQ at 81, performance IQ at 73, and full-scale IQ at 75.  (Doc. #6, PageID
at 451).  Dr. Schulz believed that these scores underestimated Plaintiff's actual cognitive
abilities because she completed college and due to her vocational history.  He further
believed that her "overall lower scores on testing are likely to be influenced by chronic pain
and depressive features rather than her actual intellectual/cognitive ability." *Id*., PageID at
452.

    In the work-related areas of mental abilities, Dr. Shulz opined: (1) Plaintiff's ability
to relate to others, including fellow workers and supervisors is not impaired; (2) her ability
to understand, remember, and follow instructions is moderately impaired; (3) her ability to
maintain attention and concentration, and to perform simple-repetitive tasks with adequate
pace and perseverance is mildly impaired; and (4) her ability to withstand the stress and
pressures associated with day-to-day work activity is moderately impaired.  *Id*., PageID at
453-54.

    Dr. Schulz diagnosed Plaintiff with dysthymia, borderline intellectual functioning,
chronic pain, and hypothyroid condition. Her then-current GAF was 56,[3] referring to
"moderate symptoms ... or moderate difficulty in social, occupational, or school functioning
(e.g., few friends, conflicts with peers or co-workers)."

---

    [3] Health care clinicians perform a Global Assessment of Functioning (GAF) to determine a
person's psychological, social, and occupational functioning on a hypothetical continuum of mental
illness.  It is, in general, a snapshot of a person's "overall psychological functioning" at or near the time
of the evaluation.  *See Hash v. Commissioner of Social Sec*., 309 Fed. Appx. 981, 988 n.1 (6th Cir. 2009).

Plaintiff received mental-health treatment with Christopher Barnes, M.A. at Miami County Mental Health. Mr. Barnes completed a form in March 2010 and signed it under his title of "psychological intern." (Doc. #6, PageID at 669-671). Mr. Barnes opined that Plaintiff was moderately impaired in most of mental work abilities, meaning she was unable to function in these areas from 11% to 25% of the work day or work week.  For example, she was moderately impaired in her ability: to respond appropriately to co-workers or peers; to process subjective information accurately and to use appropriate judgment; to carry through with instructions and complete tasks independently; to respond appropriately to changes in the work setting; and to behave predictably, reliably, and in an emotionally stable manner. In one area – the ability to be aware of normal hazards and take necessary precautions – Mr. Barnes concluded that Plaintiff was markedly impaired, meaning she was unable to function in this area from 26% to 50% of the work day or work week. *Id*. Mr. Barnes also noted that Plaintiff's condition would likely deteriorate under stress. He explained that she would likely respond to stress with increased depressive symptomology and that she "personalizes much of her performance reviews and interprets much of her interpersonal feedback as negative and a result of her defensiveness."  *Id*., PageID at 671. Mr. Barnes ultimately opined that Plaintiff's history of transplants and mental problems preclude her from employment and intensify her psychological distress. *Id.*

In April 2008, Psychologist David Dietz, Ph.D. reviewed Plaintiff's medical records for the Ohio Bureau of Disability Determinations. He recognized that Plaintiff suffered from dysthymia and borderline intellectual functioning, both medically determinable impairments.

He opined that Plaintiff had moderate restrictions in her activities of daily living; mild difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence, or pace; and no episodes of long-lasting decompensation. (Doc. #6, PageID at 468). Dr. Dietz also opined that Plaintiff was not significantly limited in most areas of her mental-work abilities and only moderately limited in her five work abilities. For example, she was – according to Dr. Dietz – moderately limited in her ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. *Id.*, PageID at 472-73.

Dr. Dietz noted that although Plaintiff's alleged disability onset date is August 3, 2003, her medical records do not contain "psych evidence" until March 28, 2008. *Id.*, PageID at 474. Dr. Dietz then summarized the results of Plaintiff's previous consultative examination (with Dr. Schulz). And Dr. Dietz summarized his evaluation of Plaintiff's work abilities as follows:

> While [Plaintiff] shows signs and symptoms of mental problems, she retains the ability to perform simple 2-3 step work in a low stress environment where job duties would be static and change could easily be explained. Weight was given to the current CE [consultative] examiner. The claimant's statements would be considered partially credible. She reports on ADL [activities of daily living] form that she goes shopping once a month and at CE she reports her friend does all the shopping.

(Doc. #6, PageID at 475).

In May 2008, Dr. Caldwell reviewed Plaintiff's medical records and provided the Ohio Bureau of Disability Determinations with her assessment of Plaintiff's physical work

abilities. Dr. Caldwell concluded that Plaintiff could lift up to 20 pounds occasionally and 10 pounds frequently but she would need to alternate between sitting, standing and walking as needed. (Doc. #6, PageID at 491). Dr. Caldwell restricted Plaintiff to inside work only, and Dr. Caldwell found Plaintiff to be partially credible since her symptoms were attributable to medically determinable impairment and are in proportion to the expected severity caused by the impairment. *Id.*, PageID at 494.

In October 2008, Dr. Cho reviewed the medical evidence of record at the request of the Ohio Bureau of Disability determination. She agreed with Dr. Caldwell's assessment. However, Dr. Cho did not provide any written analysis of the medical records or any explanation of why she agreed with Dr. Caldwell. *Id.*, PageID at 524.

## III.  Administrative Review

### A.    "Disability" Defined

To be eligible for SSI or DIB a claimant must be under a "disability" within the definition of the Social Security Act. *See* 42 U.S.C. §§423(a), (d), 1382c(a). The definition of the term "disability" is essentially the same for both DIB and SSI. *See Bowen v. City of New York*, 476 U.S. 467, 469-70 (1986). A "disability" consists only of physical or mental impairments that are both "medically determinable" and severe enough to prevent the applicant from (1) performing his or her past job and (2) engaging in "substantial gainful activity" that is available in the regional or national economies. *See Bowen*, 476 U.S. at 469-70.

A DIB/SSI applicant bears the ultimate burden of establishing that he or she is under

8

a disability. *See Key v. Callahan*, 109 F.3d 270, 274 (6th Cir. 1997); *see Wyatt v. Secretary of Health and Human Services*, 974 F.2d 680, 683 (6th Cir. 1992); *see also Hephner v. Mathews*, 574 F.2d 359, 361 (6th Cir. 1978).

**B.    The Sequential Evaluation**

Social Security Regulations require ALJs to resolve a disability claim through a five-Step sequential evaluation of the evidence. *See* 20 C.F.R. §404.1520(a)(4). Although a dispositive finding at any Step terminates the ALJ's review, *see also Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007), if fully considered, the sequential review considers and answers five questions:

1.    Is the claimant engaged in substantial gainful activity?

2.    Does the claimant suffer from one or more severe impairments?

3.    Do the claimant's severe impairments, alone or in combination, meet or equal the criteria of an impairment set forth in the Commissioner's Listing of Impairments, 20 C.F.R. Subpart P, Appendix 1?

4.    Considering the claimant's residual functional capacity, can the claimant perform his or her past relevant work?

5.    Considering the claimant's age, education, past work experience, and residual functional capacity, can the claimant perform other work available in the national economy?

*See* 20 C.F.R. §404.1520(a)(4); *see also Gayheart v. Commissioner of Social Sec.*, 710 F.3d 365, 374-75 (6th Cir. 2013).

**C.    The ALJs' Respective Decisions**

ALJ Padilla issued a non-disability decision in September 2006 denying a benefits

9

application Plaintiff filed in 2003.  (Doc. #6, PageID at 105-114).  Plaintiff points out that ALJ Padilla found (at Steps 2 and 3) that she "has the 'severe' impairment of status/post kidney transplant, but that she does not have an impairment or combination of impairments listed in, or medically equal one in [the Listings]." (Doc. #6, PageID at 113).

At Step 4 of the sequential evaluation, ALJ Padilla concluded that Plaintiff had the residual functional capacity "to perform light work..., if she is allowed to alternate between sitting, standing, and walking as needed, and is limited to inside work." *Id*.

Turning to ALJ Redmond's December 2010 decision – the decision Plaintiff challenges in the present case – his significant findings began at Step 2 when he identified the Plaintiff's severe impairments of "mild degenerative joint disease of the right hip; mild degenerative joint disease of the knees; history of coronary artery disease; dysthymic disorder; and anxiety disorder."  (Doc. #6, PageID at 61) (citations omitted).

ALJ Redmond concluded at Step 3 that Plaintiff did not have an impairment or combinations of impairments that meet or equal an impairment in the Listings. *Id*., PageID at 64.

At Step 4 ALJ Redmond found:

> [T]he claimant has the residual functional capacity to perform light work .... Giving [her] the benefit of the doubt with regard to her allegations and subjective complaints, it is found that she is limited to simple tasks that would afford her the opportunity to alternate between sitting and standing for 15 minutes each hour. She is further limited to work that can be performed in a clean-air, temperature-controlled environment. She is restricted to jobs that would not involve production quotas.

*Id*., PageID at 64-65. ALJ Redmond also found that Plaintiff could no longer perform her

past relevant work. *Id.*, PageID at 68.

At Step 5 ALJ Redmond determined that Plaintiff could perform a significant number of jobs that exist in the national economy.  *Id.*, PageID at 69.

These conclusions, along with the ALJ's findings throughout his sequential evaluation, led him to ultimately conclude that Plaintiff was not under a disability from August 3, 2003 through December 6, 2010 (the date of the ALJ's decision). The ALJ therefore denied Plaintiff's DIB and SSI applications.  *Id.*, PageID at 70.

## IV.   <u>Judicial Review</u>

Judicial review of an ALJ's decision proceeds along two lines: "whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence." *Blakley v. Comm'r of Social Sec.*, 581 F.3d 399, 406 (6th Cir. 2009); *see Bowen v. Comm'r of Social Sec.*, 478 F.3d 742, 745-46 (6th Cir. 2007). Review for substantial evidence is not driven by whether the Court agrees or disagrees with the ALJ's factual findings or by whether the administrative record contains evidence contrary to those factual findings. *Rogers v. Comm'r of Social Sec.*, 486 F.3d 234, 241 (6th Cir. 2007); *see Her v. Comm'r of Social Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999). Instead, the ALJ's factual findings are upheld if the substantial-evidence standard is met – that is, "if a 'reasonable mind might accept the relevant evidence as adequate to support a conclusion.'" *Blakley*, 581 F.3d at 407 (quoting *Warner v. Comm'r of Social Sec.*, 375 F.3d 387, 390 (6th Cir. 2004). Substantial evidence consists of "more than a scintilla of evidence but less than a preponderance..." *Rogers*, 486 F.3d at 241.

11

The second line of judicial inquiry – reviewing for correctness the ALJ's legal criteria – may result in reversal even if the record contains substantial evidence supporting the ALJ's factual findings. *Rabbers v. Comm'r of Social Sec.*, 582 F.3d 647, 651 (6th Cir. 2009); *see Bowen*, 478 F3d at 746. "[E]ven if supported by substantial evidence, 'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers*, 582 F.3d at 651 (quoting in part *Bowen*, 478 F.3d at 746 and citing *Wilson v. Comm'r of Social Sec.*, 378 F.3d 541, 546-47 (6th Cir. 2004)).

## V.    DISCUSSION

### A.    <u>The Parties' Contentions</u>

Plaintiff raises two main arguments:

I.    The ALJ failed to properly identify Ms. Gates' severe impairments of borderline intellectual functioning, diverticulosis, back/neck pain, and syncope because each of the impairments more than minimally decreased her ability to function.

II.    The ALJ's residual functional capacity [assessment] is unsupported by substantial evidence because it is not based on support in the medical evidence of record.

(Doc. #6, PageID at 1712, 1717). In support of her second main argument, Plaintiff maintains that the ALJ failed to properly evaluate treating therapist Mr. Barnes' opinions and completely neglected to address the opinions provided by the state-agency reviewers – Drs. Dietz and Caldwell.

The Commissioner argues that substantial evidence supports the ALJ's conclusion

12

that Plaintiff's borderline intellectual functioning, diverticulosis, back/neck pain, and syncope did not cause her any credible functional limitations. (Doc. #12, PageID at 1735). The Commissioner further argues that substantial evidence supports the ALJ's assessment of Plaintiff's residual functional capacity. And the Commissioner maintains that the ALJ provided sufficient rationale for the weight he placed on the opinions provided by Mr. Barnes and Drs. Dietz and Caldwell.

### B.     Analysis – Plaintiff's First Issue

Plaintiff first finds error in the ALJ's conclusion that her borderline intellectual functioning did not constitute a severe impairment under the *de minimis* test applicable at Step 2 of the sequential evaluation. Plaintiff reasons that her IQ scores below 80 required the ALJ to find this severe impairment at Step 2. Plaintiff maintains that the ALJ erred by playing doctor and making his own medical findings.

Step 2 of the sequential analysis – determining whether the claimant has a severe impairment – creates "a *de minimis* hurdle in the disability determination process....  Under the ... *de minimis* view, an impairment can be considered not severe only if it is a slight abnormality that minimally affects work ability regardless of age, education, and experience." *Higgs v. Bowen*, 880 F.2d 860, 862 (6th Cir. 1988). The purpose of this very low evidentiary hurdle is to "screen out claims that are 'totally groundless.'" *Higgs*, 880 F.2d at 862 (quoting in part *Farris v. Secr'y of Health & Human Serv.*, 773 F.2d 85, 89-90 (6th Cir. 1985)). The *Higgs* Court characterized the dismissal of a disability claim at Step 2 based on medical evidence alone as "exceptional." 880 F.2d at 863.

13

Contrary to Plaintiff's contentions, her IQ test results did not require the ALJ to find that her borderline intellectual functioning constituted a severe impairment at Step 2 because there existed evidence-based reasons for questioning the validity of Plaintiff's test results at Step 2, and Step 3 for that matter, of the sequential analysis. The ALJ correctly recognized that Plaintiff earned a bachelor's degree in psychology, a fact tending to show that Plaintiff's IQ test results underestimated her cognitive abilities. Substantial evidence supported the conclusion that Plaintiff held a bachelor's degree in psychology through her testimony during ALJ Redmond's hearing.  (Doc. #6, PageID at 83).  Additionally, in January 2010, Plaintiff completed a form for therapist Stacy Fellers, indicating that she had a bachelor's degree in psychology and had no history of learning difficulties. *Id*. at 834. Therapist Fellers estimated that Plaintiff's intelligence was average and her insight was fair. *Id*., PageID at 843. Similarly, Plaintiff's former primary care physician, Dr. Abbott, noted that Plaintiff's mini-mental-status test was fine and that Plaintiff "was starting [with] some early memory loss, not enough to document." *Id*., at 519. The ALJ also reasonably considered the fact that Dr. Schulz's diagnosis of borderline intellectual functioning was not corroborated by any treating mental health source.  (Doc. #6, PageID at 64).

In addition, as the ALJ indicated, Plaintiff's past jobs (case manager and clerk) involved semi-skilled work. (Doc. #6, PageID at 68, 95). "Semi-skilled work is work which needs some skills but does not require doing the more complex work duties. Semi-skilled jobs may require alertness and close attention to watching machine processes; or inspecting, testing or otherwise looking for irregularities; or tending or guarding equipment, property,

14

materials, or persons against loss, damage or injury; or other types of activities which are similarly less complex than skilled work, but more complex than unskilled work." 20 C.F.R. § 404.1568(b).

Plaintiff contends that the ALJ ignored the results of her July 2008 MRI, showing ischemic changes. Plaintiff maintains that these objective test results supported the conclusion that she has a severe cognitive impairment and may have supported the conclusion that she meets Listing 12.02 (Organic Mental Disorders) and may have warranted additional functional limitations. These contentions lack merit.

For the reasons previously stated, substantial evidence supported the ALJ's Step 2 findings. Thus, even if the July 2008 MRI constituted evidence that conflicts with the ALJ's Step 2 findings, such evidence does not eliminate the substantial evidence supporting the ALJ's findings at Step 2. *See Her*, 203 F.3d at 389-90 ("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached."). And the ALJ reasonably concluded that Plaintiff's impairments did not meet or medically equal a listed impairment. The state-agency mental-health consultants opined that Plaintiff's impairments did not meet or equal a listing. *See* Doc. #6, PageID at 458, 523; *see also Curry v. Secr'y of Health & Human Serv.*, 856 F.2d 193, 1988 WL 89340 at *5 (6th Cir. Aug. 28, 1988) (citations omitted) (reviewing physician's opinion that the claimant's condition did not equal requirements of a listed impairment demonstrated that the ALJ adequately considered medical equivalence at Step3). No treating medical source offered the opinion that Plaintiff

15

suffered from a marked limitation, as required by Listing 12.02(C). Furthermore, Dr. Abbott

requested the July 2008 MRI because of Plaintiff's complaints of decreased hearing and

dizziness, the implication being that he did not refer her for evaluation of possible borderline

intellectual disorder or other cognitive difficulties. (Doc. #6, PageID at 847). And, one week

before ordering the MRI, Dr. Abbott had already discounted Plaintiff's reports of memory

loss as "not enough to document." *Id*. at 519, 847.

Turning to Plaintiff's diverticulosis, back and neck pain, and syncope, Plaintiff argues

that the ALJ should have identified these additional conditions as severe impairments. She

points out that an EGD and colonoscopy confirmed that she had

diverticulosis and needed continued medical treatment for this condition. But these facts say

little, if anything, about the severity of these conditions and thus are minimally probative of

whether her diverticulosis constituted a severe impairment. *See Higgs*, 880 F.2d at 863

("The mere diagnosis of arthritis, of course, says nothing about the severity of the

condition."). The fact, moreover, that she was prescribed medications for her gastrointestinal

issues does not by itself demonstrate that her diverticulosis was a severe impairment. In

December 2006, Plaintiff had only "occasional loose stools associated with diverticulosis."

(Doc. #6, PageID at 279). She reported occasional diarrhea in October 2009.  *Id*, PageID at

665. Multiple treatment notes indicated the absence of nausea, vomiting, abdominal pain,

diarrhea, or blood in stools. *Id*., PageID at 652, 665, 747, 796, 807 (some nausea, no

vomiting).

Dr. Katrapati noted on one occasion that Plaintiff's vague abdominal tenderness was

16

probably caused by diverticulosis, and he did not view antibiotics as necessary at that time

*Id.*, PageID at 807. Although a May 2010 EGD and colonoscopy revealed chronic active

gastritis, diverticulosis, and irritable bowel syndrome, there was no evidence of

inflammation or ulceration, and Plaintiff was "[d]oing better on treatment" at that time. *Id.*,

PageID at 796. As to Plaintiff's assertion that her dizziness, near syncope, and dyspnea

(shortness of breath) were severe impairments, these complaints were at most intermittent.

*Id.*, PageID at 665. Multiple records indicated the absence of syncope or presyncope and

dyspnea. *Id.*, PageID at 572, 652, 797, 802. A January 2010 progress note indicated that

Plaintiff's prior complaints of wheezing had resolved. *Id.*, PageID at 811. Also, Plaintiff

was frequently noted to be in no acute distress. *Id.*, PageID at 624, 665, 802, 807.

Plaintiff further contends that her back/neck pain were severe impairments based on

her imaging studies, which showed disc narrowing with endplate lipping on her thoracic

spine x-ray and an endplate spur on her cervical spine x-ray. *Id.*, PageID at 635-36. Yet,

treatment notes in October 2009 and January, February, and April 2010 indicated that she

denied joint or muscle pain, and she exhibited no clubbing, cyanosis, or edema in her

extremities; she had normal muscle tone and strength, a grossly intact motor and sensory

exam, and a normal gait. *Id.*, PageID at 653, 749, 797-98, 802. Given this substantial

evidence, the ALJ reasonably declined to identify Plaintiff's symptoms of dizziness,

syncope, dyspnea, and back/neck pain as severe impairments. Furthermore, substantial

evidence supports the conclusion that these conditions did not cause credible functional

limitations. For example, two months after Plaintiff underwent back and neck x-rays, her

17

treating physician declined to provide an opinion supporting her disability application, explaining that her nephrologist, Dr. Katrapati, had not diagnosed her as disabled. *Id.*, PageID at 809. The record also reflects that, in January 2010, Plaintiff reported that she had walks frequently and had no limitations in her mobility, and she was discharged with no restrictions on her activities. *Id.*, PageID at 688, 715.

Even if the ALJ erred by not finding at Step 2 that Plaintiff's impairments (borderline intellectual functioning, diverticulitis, etc.) were severe, the error was harmless. The ALJ's conclusion that Plaintiff suffered from other severe impairments effectively meant that she cleared Step 2 of the sequential evaluation. This is seen in the ALJ's continued sequential evaluation where he considered Plaintiff's severe and non-severe impairments when assessing her residual functional capacity at Step 4. *See* Doc. #6, PageID at 65-68; *see also Anthony v. Astrue*, 266 Fed. Appx. 451, 457 (6th Cir. 2008) (Once the plaintiff cleared Step 2, the ALJ's further sequential evaluation considered the plaintiff's severe and non-severe impairments. "The fact that some of Anthony's impairments were not deemed to be severe at Step 2 is therefore legally irrelevant."); *cf. Thompson v. Astrue*, 2011 WL 3861693 at *15 (S.D. Ohio Jul. 28, 2011) (Bowman, M.J.)[4] (ALJ adequately accommodated claimant's borderline intellectual functioning by limiting claimant to remembering and carrying out only short and simple instructions.") (citing *Newland v. Apel*, 182 F.3d 918, 1999 WL 435153, at *6 (6th Cir. June 17, 1999)).

---

[4] Report and Recommendation adopted, *Thompson v. Astrue*, 1:10-CV-371, 2011 WL 3862084 (S.D. Ohio Sept. 1, 2011) (Spiegel, D.J.).

Accordingly, for the above reasons, Plaintiff's arguments in support of her first issue lack merit.

**C.      Analysis – Plaintiff's Second Issue**

**1**.

Plaintiff argues that substantial evidence does not support the ALJ's residual functional capacity assessment because he adopted ALJ Padilla's previous assessment despite ALJ Redmond's additional findings of new and more limiting impairments. Plaintiff asserts that her new impairments – especially her right hip and bilateral knee degenerative joint disease and coronary artery disease – constituted material evidence mandating a new residual functional capacity finding under *Drummond v. Secr'y of Health & Human Servs.*, 126 F.3d 837, 840-43 (6th Cir. 1997). Plaintiff further argues that ALJ Redmond engaged in a "blanket dismissal of developing new residual functional capacity without examining the opinion evidence despite his own admission that there was new and material evidence." (Doc. #9, PageID at 1717).

Contrary to Plaintiff's contentions, ALJ Redmond recognized that Acquiescence Ruling 98-4(6), 1998 WL 283902 (June 1, 1998), required him to apply *Drummond* and bound him to ALJ Padilla's earlier residual functional capacity assessment, unless there was new and material evidence relating to the assessment.  (Doc. #6, PageID at 65). ALJ Redmond noted that the prior ALJ determined that Plaintiff would be able to perform work at the light level of exertion and that there was "no evidence of a significant change in [Plaintiff's] physical condition that would support a change in the exertional level." *Id.*,

19

PageID at 65.  ALJ Redmond, moreover, discussed that the residual functional capacity for a reduced range of light work "adequately addresses the location, duration, frequency, and intensity of [Plaintiff]'s alleged symptoms, as well as, precipitating and aggravating factors." *Id.*, PageID at 67. He further explained that there was "no evidence that [Plaintiff]'s impairments significantly restrict her activities of daily living. She is able to live alone. She reported that she was independent in self-care. She had a driver's license and drove." *Id.*, PageID at 67, 82, 450; *see Warner v. Comm'r of Social Sec.*, 375 F.3d 387, 392 (6th Cir. 2004) (permitting an ALJ to consider daily activities such as housework and social activities in evaluating complaints of disabling pain). The ALJ also noted that there was "no evidence of any ongoing treatment for the arthritis of her right hip and knees," and the assessment of Plaintiff's residual functional capacity afforded her "a sit/stand option to address the effects of her hip and knee arthritis." *Id.*, PageID at 67; *see* 20 C.F.R. § 404.1529(c)(3)(v), (c)(4) (relevance of treatment received when evaluating functional limitations).

Plaintiff also points to her impairments of mild degenerative joint disease in her right hip and knees as evidence of changes in her physical condition warranting additional physical limitations in her residual functional capacity. However, treatment notes indicated that Plaintiff's right hip pain was "off and on" rather than constant, and Plaintiff experienced only occasional knee discomfort. (Doc. #6, PageID at 337, 665). Even when Plaintiff complained of pain, her contemporaneous physical examination findings were unremarkable. For example, when Plaintiff complained of bilateral knee pain in early January 2010, examination merely revealed some crepitus (crackling) in the right knee, but

20

no swelling, redness, warmth or point tenderness. *Id*, PageID at 633. The left knee

examination was normal, including normal range of motion and no crepitus. *Id*. Also, despite

complaints of back and hip pain in early October 2009, Plaintiff had a normal gait. *Id*.,

PageID at 665. Furthermore, multiple other treatment notes from 2009 and 2010 indicated

that Plaintiff denied joint or muscle pain and exhibited no clubbing, cyanosis, edema in her

extremities; she had normal muscle tone and strength, ability to move all extremities, a

grossly intact motor and sensory exam, and a normal gait.  *Id*., PageID at 653,

749, 797-98, 802. And the ALJ correctly observed that there was "no evidence of any

ongoing treatment for the arthritis of [Plaintiff's] right hip and knees." *Id.,* PageID at 67. In

light of Plaintiff's intermittent complaints and minimal clinical abnormalities, the ALJ

reasonably concluded that an RFC for light work with a sit/stand option sufficiently

accommodated her symptoms.  *See* 20 C.F.R. §§ 404.1529(c)(2), (c)(3)(v) (discussing

relevance of clinical findings and treatment received when evaluating functional

limitations).

Plaintiff next argues that her cardiac functioning worsened after her previous adverse

disability decision, warranting additional limitations in her residual functional capacity. But,

as the ALJ discussed, Plaintiff's chest pain appeared to be non-cardiac in origin.  (Doc. #6,

PageID at 62, 531, 601). Additionally, the ALJ explained that Plaintiff's cardiologist (Dr.

Siraj) had characterized her coronary artery disease as "mild" and capable of being managed

with medications.  *Id*., PageID at 67, 601, 791. Dr. Siraj noted that, while Plaintiff had

objective findings of mild-to-moderate mitral regurgitation and mild atrial regurgitation,

these were asymptomatic and required no specific therapy.  *Id.*, PageID at 62, 601, 791-92.

Follow-up appointments after her January 2010 emergency room visit for chest pain

indicated that Plaintiff no longer had chest pain and felt "much better," possibly because

esophageal dilation improved her symptoms. *Id.*, PageID at 810-11. An echo test found no

evidence of myocardial ischemia. *Id.*, PageID at 537. Thus, in view of the above

evidence, the ALJ reasonably concluded that there was "no evidence of a significant change

in [Plaintiff's] physical condition that would support a change in the exertional level." *Id.*,

PageID at 65.

Plaintiff further argues that her age category changed since the prior ALJ's decision,

from a younger individual to an individual closely approaching advanced age. However,

during ALJ Redmond's hearing, which post-dated ALJ Padilla's decision, the vocational

expert considered a person of Plaintiff's "age, education, and work experience" when

identifying jobs that she could perform. *Id.*, PageID at 95. The ALJ found, moreover, that

Plaintiff's age category had changed to closely approaching advanced age (between ages 50

and 54).  (Doc. #6, PageID at 68; *see* 20 C.F.R. §404.1563(d)). Given the older age category

that ALJ Redmond identified, along with the vocational expert's consideration of a

hypothetical person closely approaching advanced age, it is clear that the ALJ sufficiently

considered Plaintiff's correct age category at the time of his decision.

Accordingly, Plaintiff's contentions regarding new and material evidence,

*Drummond*, and Ruling 98-4(6), 1998 WL 283902 lack merit.

**2.**

22

Plaintiff contends that ALJ Redmond erred by not evaluating the opinions provided by Plaintiff's treating therapist, Mr. Barnes, under the required regulatory factors and under Social Security Ruling 06-3p, 2006 WL 2329939 (Aug. 9, 2006). This contention lacks merit.

The ALJ correctly noted that Mr. Barnes was a psychology intern and, as such, was not an acceptable medical source (PageID#64, 66). Opinion evidence may originate from three types of sources: "acceptable medical sources" (physicians, licensed or certified psychologists, optometrists, podiatrists, and qualified speech-language pathologists); medical sources who are not "acceptable medical sources," such as physical therapists, nurse practitioners, and physician assistants); or "non-medical sources," such as teachers, counselors, and social workers. *See* Social Security Rule 06-3p; *see also* 20 C.F.R. § 404.1513. Statements from acceptable medical sources about the nature and severity of a claimant's impairments are medical opinions that must be evaluated according to the factors set forth in 20 C.F.R. § 404.1527.

In addition, Ruling 06-3p explains:

> Since there is a requirement to consider all relevant evidence in an individual's case record, the case record should reflect the consideration of opinions from medical sources who are not "acceptable medical sources" and from "non-medical sources" who have seen the claimant in their professional capacity. Although there is a distinction between what an adjudicator must consider and what the adjudicator must explain in the disability determination or decision, the adjudicator generally should explain the weight given to opinions from these "other sources," or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case....

23

2006 WL 2329939 at *6.

     In the present case, ALJ Redmond cited to and properly invoked Ruling 06-3p when

evaluating Mr. Barnes' opinions.  *See* Doc. #6, PageID at 66. He noted that Ruling 06-3p

requires the evaluation of both acceptable and non-acceptable medical source opinions

"under the criteria set forth in 20 C.F.R. §404.1527 and 461.927."  *Id*.  ALJ Redmond then

listed the specific criteria set forth in these Regulations.  *Id*.  And he explained that Mr.

Barnes' opinion was "not entitled to any special weight" because "his opinion [wa]s not

supported by his treatment notes (Exhibit C-31F)."  *Id*.  Elsewhere in ALJ Redmond's

decision, he recognized that the mental health treatment notes in Exhibit C-31F documented

an initial diagnosis of only "mild" recurrent major depressive disorder and generalized

anxiety disorder, to be treated with group therapy. (Doc. #6, PageID at 845-46). The

subsequent group therapy progress notes, which were authored by a psychology intern

whose signature appeared to be that of Mr. Barnes (*compare id.*, PageID at 814-29

*with* PageID at 671), indicated that Plaintiff interacted with other members during her group-

counseling sessions, receiving and sharing feedback.  *Id*., PageID at 814-16, 818. She was an

active participant and did not exhibit suicidal or homicidal ideation.  *Id*.,

PageID at 814-15, 818-20, 826

     In contrast to Plaintiff's January 2010 intake examination, at which she appeared

depressed, *id*., PageID at 832, Mr. Barnes' individual progress note in March 2010 indicated

that Plaintiff's mental status examination was normal.  *Id*., PageID at 824. She exhibited a

normal mood/affect, logical thought process, and cooperative behavior, and was a danger to

no one. *Id*.

Furthermore, by twice highlighting the fact that Mr. Barnes was a psychology intern, the ALJ also touched on another relevant factor under Ruling 06-3p – Mr. Barnes' specialty and (lack of) expertise. *See* 2006 WL 2329939 at *4 (relevance of whether the source has a specialty or area of expertise related to the individual's impairment).

For all these reasons, substantial evidence supports the ALJ's weighing of the opinions provided by Mr. Barnes.  *See* Ruling 06-3p, 2006 WL 2329939 at *4 (relevant factor is "degree to which the source presents relevant evidence to support an opinion").

**3.**

Plaintiff maintains that the ALJ erred by not sufficiently explaining the weight given to the state agency psychologist, Dr. Dietz, and state agency physician, Dr. Caldwell, as required by Social Security Ruling 96-6p.

Plaintiff acknowledges that this is not a case where the ALJ completely ignored the opinions of the state agency consultants, and she acknowledges that the ALJ briefly discussed their findings at Step 2.  *See* Doc. #9, PageID at 1721. Specifically, the ALJ discussed that the state agency physicians reviewed the medical record and "concluded that [Plaintiff] would be able to perform a reduced range of light work. The State Agency reviewers based their restrictions on diagnoses of the residuals of two renal transplants and 'mild' osteoarthritis of the hip." *Id*., PageID at 62. With respect to the state agency mental health consultants, the ALJ explained that they reviewed Dr. Schulz's consultative examination findings and "concluded that [Plaintiff] would be able to perform simple tasks

25

in a low stress, static work environment." *Id*., PageID at 63. The ALJ's residual functional capacity evaluation similarly restricted Plaintiff to light exertional work and simple tasks without production quotas.  *Id*., PageID at 64-65. However, Plaintiff argues that these statements were insufficient because the ALJ did not include a discussion of these opinions in the residual functional capacity section of his decision and did not otherwise explain the weight assigned to the opinions.

Although the ALJ certainly could have addressed Drs. Dietz and Caldwell at Step 4 of the sequential evaluation, "it is proper to read the ALJ's decision as a whole," and "it would be a needless formality to have the ALJ repeat substantially similar factual analyses" in different parts of the decision. *Rice v. Barnhart*, 384 F.3d 363, 370 n.5 (7th Cir. 2004); *see Jones v. Comm'r of Social Sec*.,  2012 WL 727737 at *23 (N.D. Ohio Mar. 6, 2012) (Knepp, M.J.). Furthermore, if the ALJ's evaluation of the opinions provided by these medical sources was insufficient under the Regulations, this error was harmless. *See Wilson*, Neither Dr. Dietz nor Dr. Caldwell identified specific limitations on Plaintiff's work abilities that were significantly greater than those assigned by the ALJ at Step 4. Dr. Caldwell, for example, restricted Plaintiff to light work with the requirement that she be allowed to alternate between sitting, standing, and walking. (Doc. #6, PageID at 491). Similarly, the ALJ found that Plaintiff could perform light work with the opportunity to alternate between sitting and standing for 15 minutes each hour. *Id*., PageID at 65. Although the ALJ did not include the "walking" requirement, he incorporated the main substance of the restriction set by Dr. Caldwell.

Accordingly, Plaintiff's challenges to the ALJ's weighing of the state agency reviewers' opinions lack merit.

## IT IS THEREFORE RECOMMENDED THAT:

1.     The Commissioner's non-disability finding be affirmed;

2.     The case be terminated on the docket of this Court.


June 18, 2013

s/Sharon L. Ovington

Sharon L. Ovington

Chief United States Magistrate Judge

## NOTICE REGARDING OBJECTIONS

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within fourteen days after being served with this Report and Recommendations. Pursuant to Fed. R. Civ. P. 6(d), this period is extended to seventeen days because this Report is being served by one of the methods of service listed in Fed. R. Civ. P. 5(b)(2)(C), (D), (E), or (F). Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendations are based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections within fourteen days after being served with a copy thereof.

Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn,* 474 U.S. 140 (1985).